# CHARLESTON.

## BERNS *v.* GASTON GAS COAL CO.

Submitted June 13, 1885.—Decided December 5, 1885.

1. A declaration by a servant against his master for injury caused by the explosion of *fire-damp* in a coal-mine need not with particularity state the acts of omission or commission, which constituted the negligence of the master : if it is specific enough to inform the master, of what he is called upon to answer, so that he will not be surprised at the trial, it is sufficient.   (p. 288.)

2. If the facts stated in the declaration show, that the plaintiff was guilty of negligence, which immediately and directly contributed to produce the injury, the declaration is fatally defective ; but contributory negligence need not be negatived in a declaration.   (p. 290.)

3. When a servant enters into the employment of a master, he assumes all the ordinary risks incident to the employment, whether the employment is dangerous or otherwise.   (p. 300.)

4. The master must provide for the safety of his servant, as far as can reasonably be expected under the circumstances ; but he is not obliged to take more care of his servant, than he would be expected as a prudent man to take of himself.   (p. 300.)

5. If a servant wilfully encounters dangers, which are known to him or are notorious, the master is not responsible for an injury occasioned thereby.   (p. 300.)

6. The measure of care, which a master must take to avoid responsibility for injury to his servant, is that, which a person of ordinary prudence and caution would use, if his own interests were to be affected, and the whole risk were his own.   (p. 300.)

7. Negligence and ordinary care are correlative terms. What constitutes ordinary care depends on the circumstances of each particular case. It is such care as a person of ordinary prudence would exercise under the circumstances.   (p. 300.)

8. If the master has been guilty of negligence in failing to procure suitable appliances or machinery for carrying on his business, and injuries result therefrom to his servants ; he must respond in damages, unless the servant well knowing the default of the master in this respect enters upon the employment or continues therein after such knowledge, in which case he assumes the increased risk and can not hold the master for the consequences ;

but if the servant knows the defect or danger and has reasonable grounds to believe, that the master has cured or would immediately cure the same, he is not guilty of negligence by remaining in the service and may recover for injury caused by such negligence of the master.   (p. 300.)

9.  The master is not bound to furnish for his workmen the safest and best machinery nor to provide the best methods for the work, in which he is engaged, in order to save himself from responsibility for injuries to his servant.  If the machinery and appliances, which he has, be in common use and are such as can with reasonable care be used without danger to the employe, it is all that can be required of the employer.   (p. 300.)

10.  The owner of a coal-mine is not required to resort to the most expensive methods for keeping his mine free from *fire-damp* in order to escape responsibility to his servant working in the mine for injury caused by an explosion of *fire-damp*.  If he has reasonably safe methods in use for the proper ventilation of the mine and uses reasonable care to keep the mine properly ventilated and the *fire-damp* expelled therefrom, he will not be responsible.  He is not held to extraordinary care.   (p. 300.)

11.  If the proprietors of a coal-mine have been negligent in permitting *fire-damp* to accumulate in their mine, which will not produce any injury until ignited, and it be ignited by a fellow-servant, who goes into the dangerous part of the open mine with a lighted lamp instead of a safety-lamp contrary to the orders of the proprietor of the mine, and by such lighted lamp the *fire-damp* is ignited and exploded, by which a servant is injured, such explosion and injury having been directly and immediately caused by the act of the fellow-servant and not by the negligence of the master, the master under the circumstances can not be held responsible for such injury.   (p. 305.)

*A. F. Haymond* for plaintiff in error.

*J. W. Mason* and *J. Bassel* for defendant in error.

JOHNSON, PRESIDENT :

Charles Berns, an infant, by Charles Berns, his next friend, brought an action on the case in June, 1881, in the circuit court of Marion county against James O. Watson, A. Brooks Fleming and James Boyer, partners doing business as the Gaston Gas Coal Company.   There were three counts in the declaration, to which declaration and to each count thereof the defendants demurred, and the court sustained the demurrer as to the first count and overruled it as to the other two

counts. We will not examine the first count. The second and third counts, which are substantially the same, alleged in substance that the defendants were owners of a certain coal-mine in the county of Marion and were digging coal therefrom. The counts with considerable particularity described the mine and averred, that in said mine " large quantities of fire-damp, gases, fumes and vapors collected in and remained in said mine in said main drift or heading and in said lateral drifts or rooms, so that the safety of the lives and limbs of persons serving the defendants in and about their said coal-mine and while in such service going into said main drift or heading and into said lateral drifts or rooms was dependent upon the care, with which the said mine and the said main drift or heading and the said lateral drifts or rooms were ventillated and made free from said fire-damp, gases, fumes and vapors, whereof the defendants had full knowledge, whereby it became the duty of the defendants for the safety of the persons so serving them to have the said coal-mine and the said main drift or heading and the said lateral drifts or rooms carefully ventillated and made free from said fire-damp, gases, fumes and vapors." The declaration alleges that on March 27, 1880, plaintiff was in the employment and service of the defendants in said mine driving mules, hauling coal out of said mine on a tram-road, and it became necessary for him as such servant to go into the main drift or heading and into the lateral drifts or rooms; that it was the duty of the defendants to have said mine, main drift or heading and lateral drifts or rooms well ventilated and free from said fire-damp, gases, fumes and vapors; that while he was thus engaged in the service of the defendants on March 27, 1880, by reason of the carelessness and negligence of the defendants in permitting the said fire-damp, &c., to be and remain in said mine, the said *fire-damp*, &c., exploded with great power and violence and ignited and burned with great heat, by means whereof the plaintiff was greatly burned, wounded and bruised on both of his hands and on the back part of his head and was otherwise injured and was crippled and lost the use of his hands, &c. He laid his damages at $5,000.00.

The demurrer being overruled the defendents, Watson and Fleming, who had been served with process pleaded not

guilty. The judge of the circuit court of Marion county being so situated as to render it improper for him to preside at the trial, by consent of parties the case was removed to the circuit court of Taylor county for trial. On August 3, 1883, the trial was commenced and continued from day to day until August 9, when a verdict was rendered against the defendants for $2,000.00 damages. The defendants moved to set aside the verdict because contrary to the law and the evidence and because of after-discovered testimony. The second ground was supported by affidavits. The motion was overruled. Three bills of exceptions were taken to the rulings of the court, the first and second to the admission of evidence, and the third, which certifies all the evidence, to the refusal to set aside the verdict and grant a new trial.

To the judgment the defendants, Watson and Fleming, obtained a writ of error with *supersedeas.*

The first error assigned is overruling the demurrer to the second and third counts of the declaration. While it is true, as the counsel for the plaintiffs in error insists, that the object of the declaration is to set forth the facts, which constitute the cause of action, so that they may be understood by the party who is to answer them, by the jury, who are to ascertain the truth of the allegations, and the court, who is to pronounce judgment, yet it is equally true, that in an action for negligence the declaration need not state with particularity the acts of omission or commission, which constituted the negligence or wrong. (*Hawker v. R. R. Co.,* 15 W. Va. 628.) In that case the court said:

"There was no necessity for the declaration to specify the acts of omission or commission which constituted the negligence of the defendant. * * The degree of certainty required by the rules of pleading was met by the allegation, that the defendant negligently, carelessly and wrongfully caused a train of cars on its railroad to be propelled and driven upon the fat cattle of the plaintiff whereby three of them were killed, and seven others greatly bruised and injured. It is neither usual nor necessary to specify the acts or omissions of the defendant which constitute the negligence. This is matter of proof and need not be specified in the declaration. It was not specified in the declarations in the cases of

*Blaine* v. *The C. & O. R. R. Co.*, 9 W. Va. 252, and *Bayler* v. *The B. & O. R. R. Co.*, 9 W. Va. 27."

In *B. & O. R. R. Co.* v. *Whittington's Adm'r*, 30 Gratt. 805, cited by counsel for plaintiff in error it was held, that in an action for damages against a railroad company a count in the declaration, which after setting out, that the defendant was working a railroad in the county with engines and cars for carrying passengers and freight, alleged, that on a day named, " the defendants conducted themselves so carelessly, negligently and unskilfully, in the operation of their said business, as to inflict upon W. (plaintiff's intestate) severe bodily injuries by reason whereof he did on June 28 die," is defective in not stating, where the deceased was, or how he was injured. Staples, judge, in delivering the opinion of the court in holding said count bad, forcibly said :

" Now whether the plaintiff's intestate was at the time a passenger on the train and received his injuries as such, or whether he was an employe of the company, and was injured while engaged in their service, or whether he was a stranger crossing the track of the company's road, or whether he was on the track at all, or in the cars, or at a station, or in what manner he was injured the declaration does not inform us. It was impossible for the defendants to learn from this declaration the ground upon which plaintiff was proceeding. The declaration amounted to an averment simply, that the plaintiff's intestate was injured by the negligence of the defendants, in the operation of their business in using and employing their engines and cars on their railway."

The declaration here is not subject to such criticism. The plaintiff clearly informs the defendants, where he was when hurt, to-wit: in their coal-mine; what he was doing, to-wit : hauling coal for them ; who he was, to-wit: one of their servants in their employment ; by what means he was hurt, to-wit : by an explosion of fire-damp or gas in said mine, which explosion was the result of their carelessness and negligence in not keeping said mine free from said explosive gas, as it was their duty to do. I do not see why he should be required to be more explicit. He has informed the defendants of enough to put them on notice of their proper defence. That is, to show that the explosion was not the result of their neg-

ligence; that they had done all that reasonable and prudent men could be expected to do, to avoid such explosions; or that the injury occurred directly from the negligence of the plaintiff or was the immediate result of the negligence of a fellow-servant of the plaintiff unmixed with any negligence on their part.

It is suggested, that the said two counts in the declaration are fatally defective, because they show on their face contributory negligence in the plantiff; that they show he must have had knowledge that the *fire-damp* was in the mine, and that it was dangerous to go in there.

If the declaration shows such a state of facts, from which it would necessarily follow that the plaintiff was guilty of negligence, which directly and immediately contributed to his injury, there can be no doubt that it is fatally defective. (*Dimmey* v. *R. R. Co., supra,* p. 32.) Robinson in vol. 4. p. 860, of his practice has a form of a declaration by a servant against his master for injury from the fall of a defective scaffold, which alleges that the scaffold "by reason of the negligence and default of the defendant was and remained constructed very unsafely and insecurely and in such a defective, rotten and improper state and condition as to render it dangerous to remain upon the same for the purpose of doing the work which defendant then well knew, *but whereof plaintiff was wholly ignorant*; and in consequence thereof, while plaintiff was so engaged and employed, a part of the scaffold broke gave way and plaintiff was precipitated to the ground and his thigh was thereby fractured, &c." This description of the imperfect scaffold, it seems to me, is as strong to show, that the servant must have known it was unsafe, as the description in these two counts of the declaration is to show, that the plaintiff must have known that the mine was unsafe. But it may be said, that in the form referred to his knowledge was negatived. That is not necessary. If he had knowledge, he is guilty of negligence in exposing himself; but it is not necessary in a declaration to negative the fact, that the plaintiff was guilty of contributory negligence; contributory negligence is purely matter of defence. (*Sheff* v. *Huntington,* 16 W. Va 307) It seems to me the said two counts are good, and the demurrer to each was properly overruled.

Before considering the other points raised by the assignments of error, let us see what the evidence in this case tends to disclose. It shows that the defendants were the owners and proprietors of a coal-mine and were operating the same. The mine was entered not by a perpendicular shaft, but the opening went into the side of the hill. From the entrance to where the plaintiff was hurt was about 200 yards. On February 18, 1880, Woody, a miner, was hurt by an explosion of gas or fire-damp near the same place where plaintiff was hurt by the same kind of an explosion, on March 27, 1880. The proprietors knew of the first explosion and had given orders not to go into that particular part of the mine without using the safety-lamp. It is not shown that the plaintiff, who was a boy about fourteen years old, had received any such instructions or knew anything about the former explosion. On the day of the explosion when plaintiff was injured, Reese and Work, miners, went into the mine and were both killed by the explosion. Van Sickle says he told Reese before he went in, that "he would have hot work, if he went in there." "We miners mean by 'hot work,' it was too hot to work." Hamrick and Jenkins, two other miners, had been working in that heading the same day the explosion occurred. They had lights on their caps. The explosion was about an hour after Jenkins and Hamrick went out. The air was bad when they came out. It is not certain but probable, that Work and Reese did not take a safety lamp into the mine but took their ordinary mining lamps on their caps. The mine was ventilated by means of a boxing to admit fresh air, that is, by boards about a foot wide nailed together making an aperture of ten by twelve inches. The means used for ventilation was as good as that by some other mines in the county. It is shown by the evidence, that the foul air could be expelled from a mine; and that after the explosion, the heading was driven through to the open air, making a current which very much improved the ventilation. One witness, Woody, who had been a miner for twenty years and had been injured in February before, said :

" We had a furnace and box fixed to draw the air. Furnace draws the air through and creates a draft by drawing

the bad air out.  The furnace stood at the out-crop of the coal and had the box for flue upon the hill.  We had a furnace when running the long drift.  At the time I was burned, the furnace was not in use.  The furnace was destroyed and they were using the boxing in the heading I was in.  The boxing was inside the heading but no furnace ; if there was any air, it come in through the boxing to the face of the heading and went out through the drift.  *  *  The ventilation was in bad condition at that time at that place, I consider.  It could have been improved by forcing air into it in some way or other.  Air can be forced in by a steam engine with a cylinder.  I don't know of any way of forcing air except by machinery of some kind.  I never saw air forced in mines by machinery, but I have seen air forced into blast iron furnaces for making iron."

The testimony of William Rannie, a Scotchman, who had been a miner for fifty years, shows that fire-damp is lighter than air and can be safely detected with the safety-lamp ; that it sometimes explodes within the gauze of the safety-lamp ; that it will not explode unless mixed with from five to ten times its volume of air.  If mixed with less than five, or more than fifteen volumes of air it will not explode.  When once found to exist, a man ought to go through the mines every morning with the safety-lamp and examine every room and heading and air-courses and see that all is right.  It should be done in the morning, because the mine has been idle all night.  If danger is found, no nobody should go in, and there should be a cross-cut made or something to drive it out.  He went into the Gaston mine with a safety lamp shortly after the explosion, went almost up to where the dead man was found, but there was so much "after-damp," he could not see.  It was too soon after the explosion.  "After-damp" is one of the products of the combustion of fire-damp.  The mule was dead, (that is, the mule which plaintiff was driving.)  Could not see anything about the appearance of the mine.  There was too much vapor to see anything.  Mines are ventilated according to location ; but means of ventilation depend on its location.  No two mines can be ventilated in the same way.  If going up a long heading, he would take the air right straight in along one side or the other, and do it

in various ways.   There are  a dozen  ways of doing it.   It
can be done with a box,  or canvas, or brattias, or rift  inside
the coal, or with modern  fence  or  gangway.   The box  is
started from where the air is  good, from the main inlet.   A
box is a good  way of ventilating  a rising shaft, if it is  big
enough.   Never formed any opinion of  this mine.

There was much more evidence on the subject of  the ven-
tilation  of  mines.

Minear testifies that he was the pit "boss" at that mine for
about six years  before  the  explosion ; that on the morning
of the explosion he was  in  the heading  where it occurred,
and put on  a section of air-box.   The condition of the air
was as good, as far  as  he  could  see, as it ever was before.
They had a Davy safety-lamp, which the  company had  pro-
vided, and the  instructions were,  that anybody going  into
that heading was to  take the  safety-lamp and  examine the
air, and if there was any danger, they were to come out and
not stay there.   Have seen in that heading some  little  signs
of gas may be once a  week, or  may be  once a  month, for
over possibly  six months.   Thinks he told  Watson, one of
the defendants, about it six months before.

The plaintiff in his evidence says : "I was sent in  by the
time-keeper, Anthony  Van  Sickles, to  the room of Joseph
Dougherty ·for a load of  coal.   It was about three o'clock in
the afternoon.   I knew where the explosion occurred ; it oc-
curred on  the same heading I was on  at the time.   I could
not see where it occurred.   I  could  not see the end of  the
heading because it was crooked.   The explosion  went like
lightning ; *I couldn't tell nothing.*   I wasn't up there that day.
I don't know what was in the way.   I was right at the switch
going into the cross-cut, twenty-five yards  or less from where
Dougherty was  working  in a  cross-cut.   I was burned on
both my hands and head.   (Witness showed his hands to the
jury.)   My hands were as good as yours or anybody else be-
fore the injury.   The back of  my head  was burned some ;
my ears.   I was driving car and mule.   I don't know  what
became of the car.   The mule died before  they got it out of
there.   I can't tell what became of  me for some time after I
was hurt.   I was knocked down.   When I came to myself I
was inside  pulling  off  my clothes.   I started to go to  the
next room.   I found myself outside next."

I have not pretended to give all or even all the substance of the evidence, but only sufficient to enable us to make our opinion intelligible.

What is the liability of a master for the injury to his servant by his neglect? The terms negligence and ordinary care are correlative terms. What constitutes ordinary care depends on the circumstances of each particular case. It is such care as a person of ordinary prudence would exercise under the circumstances. (*Railroad Co.* v. *Ownsby*, 30 Gratt. 455.) The measure of care against accidents, which one must take, to avoid responsibility is that, which a person of ordinary prudence and caution would use, if his own interests were to be affected, and the whole risk were his own. (Nitro-Glycerine case, 15 Wall. 524.)

In *Lansing* v. *Railroad Co.*, 49 N. Y. 521, it was decided, that the duty of the master to the servant is to furnish proper, perfect and adequate machinery or other material and appliances necessary for the proposed work and to employ skilful and competent fellow-servants, or to use due and reasonable care to that end.

In *Gibson* v. *Railroad Co.*, 46 Mo. 163, it was held, that the legal implication is, that the employer will adopt suitable instruments and means, with which to carry on his business. It he fails to do so, he is guilty of a breach of duty under his contract, for the consequence of which in justice and sound reason he ought to be responsible.

*Spielman* v. *The Fisher Iron Company*, 56 Barb. 151, was an action brought against a corporation by one of its laborers employed in blasting for an injury occasioned by the premature discharge of a blast loaded with a newly invented powder, which he was directed to use by the defendant's foreman or superintendent. The complaint alleged, that the company furnished the powder for use in its ordinary and appropriate business; that its superintendent directed its use by the plaintiff in such business; that it had never been used as an explosive in blasting and was in fact unfit and unsafe for such use; and that the plaintiff was ignorant of its dangerous properties; it was held on demurrer that a right of action was unquestionably stated; also that the plaintiff under his contract assumed the risk of personal injury in blast-

ing with the ordinary appliances and for that purpose, but not these risks attendant upon the use of an unusual, untested and exceedingly dangerous article, which could not be tamped without inevitable explosion, which dangerous quality was unknown to him; that it was gross negligence in the company to furnish such an article for the laborer's use without giving him information in that particular; whether the company was aware of its dangerous quality, or furnished it for use without having taken any steps to obtain such knowledge.

In *Snowden* v. *Mining Company*, 55 Cal. 443, it was decided, that in an action by an employe for injury incurred in the course of the employment the court below having at the request of the plaintiff instructed the jury, that "the servant assumes no risk, except such, as existed at the beginning of the employment, and such as are incidental to the business," the court should have added words equivalent to "*or which existed during the course of the employment, of which the employe had knowledge or was bound to have knowledge.*"

In *Johnson* v. *Brown*, 61 Pa. St., it was decided, that, where an injury happens to a servant in the course of his employment, the master is responsible, if it was caused by his negligence, but if it was the result of the hazardous nature of the employment, he is not liable, unless his negligence was the direct and proximate cause of the injury. An employer does not impliedly guarantee the absolute safety of his employes. In accepting, the latter is assumed to have have notice of all patent risks incidental thereto, or of which he is informed, or of which it is his duty to inform himself, and is assumed to undertake to run such risks.

In *Sykes* v. *Parker*, 99 Pa. St. 465, the plaintiff was injured by a fall from a building, which he was helping to construct, which fall was occasioned by the removal of certain tackling. The court below charged, that, if the defendant caused to be removed a support essential to keep the building in position without notifying the plaintiff, and the plaintiff did not know of such removal, and it was improper to cause such removal, then the defendant was guilty of negligence. Held: This was error; the jury should have been instructed, that, if the defendant acted in good faith in directing the removal of the

tackle, believing according to the best of his judgment, that there was no danger in so doing, he was not guilty of negligence. They should also have been instructed, that the omission of the defendant to notify the plaintiff of the removal of the tackle did not constitute negligence, as the plaintiff must be held to have been cognizant of that, which was clearly visible to his sight.

In *Coal Company* v. *Heaber*, 84 Ill. 127, it was held, that under the statute of Illinois the widow was entitled to recover damages for the death of her husband caused by a fire in the mine, which was purely accidental, for the neglect to have a second means of escape as required by the statute. See also *Bartlett Coal & Mining Co.* v. *Roach*, 68 Ill. 174, and *The Litchfield Coal Co.* v. *Taylor*, 81 Ill. 590.

A workman employed in any dangerous occupation takes it with all ordinary risks. The master is bound to provide for the safety of his workmen, as far as can be reasonably expected, and he must not use any art to conceal dangers, but he is not obliged to take more care of his servant, than he would be expected as a prudent man to take of himself. If a workman reasonably apprehends danger from any particular acts, he may decline to do them. If he willingly or wilfully encounters dangers, which are known to himself, or which are notorious, the master is not responsible. Thus a coal-owner will not be liable for accidents from explosions of gas found in the due course of working, or from irruptions of water, if ordinary precautions have been taken by him. But a master is bound to protect his workmen against unnecessary risks in works of danger. (Bainbridge on Mines and Minerals, Am. Ed. by G. M. Dallas, 468.)

Is it necessary for a master to have the best machinery in his works, or is it sufficient, that he has machinery and appliances that are reasonably safe ? In *Devitt* v. *Railroad Co.*, 50 Mo. 302, it was held, that, if the principal has been guilty of fault or negligence either in providing suitable machinery or in the selection or employment of agents or servants, and injuries arise in consequence, he must respond in damages. But when the servant himself well knowing the default of his principal, as in providing defective or unsuitable machinery, voluntarily enters upon the employment, he assumes the risk and can not

hold his employer for the consequences. (*Railroad Co.* v.
*Bishop*, 50 Ga. 465.)

In *Payne* v. *Reese*, 100 Pa. St. 301, it was decided, that an
employer is not bound to furnish for his workmen the safest
machinery nor to provide the best methods for its operation,
in order to save himself from responsibility for accidents re-
sulting from its use.  If the machinery be of an ordinary
character, and such as can with reasonable care be used with-
out danger to the employe, it is all that can be required of
the employer.

In *Railroad Co.* v. *Gildersleeve*, 33 Mich. 133, it was held,
that an employer can not properly be held to be under so
strict obligation to his servants, as to be required under all
circumstances to make use only of the safest known appli-
ances and instruments, and to be held responsible for any
failure to discard what is not such and to supply its place with
something better and safer.  In that case, the company were
using an old mail-car, which was lower than the other cars
and more difficult to couple, and the plaintiff's intestate was
killed while attempting to couple such low car with a higher
one. Cooley, C. J., in delivering the opinion of the court said :

" The car which was the cause of the injury in this case
was not in itself dangerous, or unfit for use.  In coupling it
with other cars peculiar caution was requisite, making it
more liable to cause injury than would be a car of more mod-
ern construction.  Its use therefore made the employment
more dangerous than it otherwise would be. In that particu-
lar the case may be compared to that of a farmer, who with
knowledge on the part of himself, and those in his employ,
that a horse he has had in use is disposed to be fractious, and
unmanageable, continues nevertheless to use him in his busi-
ness.  It may be compared to that of a merchant, who con-
tinues to make use of a fluid for light, when something else
which is within his reach has been demonstrated by experi-
ence to be safer.  So far as we can perceive the case of the
manufacturer would not be different in principle, who would
continue the use of a building which, in the event of a con-
flagration would subject his employes to greater risks than
one of different construction.  * * Now any rule on this
subject must be a general rule, and not one to be applied to

railroad companies alone. It will be perceived that the risk in this case was such, as would effect only the person employed, and that whatever duty was imposed by the circumstances upon any one, could have reference only to such persons. The case is consequently divested of any question except such as would concern the relation of master and servant, and the same rule would govern the case, that would govern were the questions to arise between the farmer, the mechanic or the manufacturer and the persons in his employ. And treating it as a question of such broad application, we do not perceive any ground upon which the plaintiff's case can safely be planted which comes short of this; that the employer is under obligation to his servants under all circumstances to make use of the safest known appliances and instruments, and is responsible for any failure to discard what is not such, and to supply its place with something safer. Any doctrine so far reaching as this, would be manifestly destructive of the general rule, and would almost make the employer the guarantee of his servants' safety in his employ. But under any less severe responsibility, it would be impossible to sustain a judgment against this defendant upon the sole ground of a failure to discontinue the use of this car. In any light in which the question can be viewed, no breach of duty can be charged against the defendant, unless it be the duty to make the employment as safe for the persons employed as was possible. Certainly in making use of this car no confidence which was reposed in the prudence and caution of the employer has been betrayed. The difficulties as here stated, were fully known and understood, and the intestate voluntarily continued to encounter the risk."

In *Leonard* v. *Collins*, 70 N. Y. 90, it appeared, that the servent was killed by the fall of an overhanging portion of a bank of earth, which was being excavated under the direction of the master. It was held error to charge the jury to the effect, that, if the defendant could have done anything which would have prevented the accident, his omission to do so was negligence. The court in its opinion said:

"The court in this case charged the jury that it is the duty of an employer to take all reasonable care of his workmen and therefore if they should find "that the defendant was

guilty of any negligence, omitted to do any thing by which the life of the plaintiff's intestate could have been preserved he would be liable. It was for the jury to say whether all things considered there was anything which the defendant could have devised to have prevented the accident; whether there was anything in his experience and familiarity with that kind of business which would have suggested to him there was any special danger against which he ought to take special care."

The defendant at the conclusion of the charge excepted to the following instruction to the jury: "If the defendant could have done anything to preserve the life of the deceased, that he should have done it," and the judge qualified it by saying, "Perhaps *preserve the life* is susceptible of criticism. I meant to say *anything that could have prevented the accident.*" The defendant excepted to the charge as qualified. We are of opinion, that the judge erred in this instruction. That the defendant could have done something, which would have prevented the accident, can not be doubted. But this was not the test of his liability. The question was: Was he negligent? Did he exercise ordinary care and prudence in conducting the excavation in view of the position of the deceased, the probable consequences, which would result from the falling of the overhanging earth, while the intestate was below? The error in the charge was calculated to mislead the jury upon a material point, and was not, we think, cured by the other instructions given."

Man must earn his bread, therefore he must labor. To procure labor, he must of course enter the employment of others. If capitalists were held to be insurers of the lives of those, who enter their service in their various industries whether in operating railroads, in constructing buildings, in various sorts of mining operations, and in all the multifarious ways, by which money is made, these industries would languish, and many more laborers would be out of employment, and the laboring poor would suffer infinitely more than now. Therefore it has been found necessary to adopt reasonable rules, for ascertaining the responsibility of the master for injuries to the servant.

We here state some of the rules:

When a servant enters into the employment of a master,

he assumes all the ordinary risks incident to the employment, whether the employment is dangerous or otherwise.

The master must provide for the safety of his servant, as far as can reasonably be expected under the circumstances; but he is not obliged to take more care of his servant than a prudent man would be expected to take of himself.

It a servant wilfully encounters dangers, which are known to him or are notorious, the master is not responsible for an injury occasioned thereby.

The measure of care, which a master must take to avoid responsibility for injury to his servant, is that, which a person of ordinary prudence and caution would use, if his own interests were to be affected, and the whole risk were his own.

Diligence and ordinary care are correlative terms. What constitutes ordinary care depends on the circumstances of each particular case. It is such care as a person of ordinary prudence would exercise under the circumstances.

If the master has been guilty of negligence, in failing to procure suitable appliances or machinery for the carrying on of his business, and injuries result therefrom to his servants, he must respond in damages, unless the servant well knowing the default of the master in this respect, enters upon the employment, or continues therein after such knowledge, in which case he assumes the risk and can not hold the master for the consequences; but if the servant knows the defect and has reasonable ground to believe, that the master has cured or will immediately cure the defect, he is not guilty of negligence by remaining in the service and may recover for injury caused by such negligence of the master.

The master is not bound to furnish for his workmen the safest and best machinery nor to provide the best methods for the work, in which he is engaged, to save himself from responsibility for injury to his servant. If the machinery or appliances, which he has, be of an ordinary character and such, as can with reasonable care be used without danger to the employe, it is all that can be required of the employer.

The owner of a coal mine is not required to resort to the most expensive methods for keeping his mines free from *fire-damp* in order to escape responsibility for injury to his

servants  working in the  mines caused by  the explosion of
the fire-damp.    If he has reasonably safe methods in use for
the proper ventilation of  the mine  and uses reasonable care
to keep the mine properly ventilated  and the fire-damp ex-
pelled theretrom, he will not be responsible.    He is not held
to extraordinary care.

Any different rule from this last one would be disastrous to
mining interests.    If every proprietor of  coal mines should
be held responsible for all  injuries to his servants caused by
the  explosion of fire-damp, unless  he procured all the new
and expensive  machinery which  might  be invented to pre-
vent  such explosions, the result might be, that a monopoly
in mining would  be created, because  none but heavy capi-
talists would be able to procure the new machinery.

The first bill of exceptions is  to  the following  questions
and answers of  the witness, Woody :

"State whether, at the  time you were injured at the  point
you have named, the ventilation of  said mine was defective
at said  point, and  whether  by any  practicable means then
known or in use by persons engaged in  mining coal the ven-
tilation  of said  mine at said  point could have  been im-
proved ?"

Against the objection of defendants the witness was per-
mitted to answer as follows :

"The ventilation was in bad condition at that time, at that
place, I consider.    It could have  been  improved by forcing
air into it in  some way or other.    Air can be forced in  by a
steam  engine with  a  cylinder.    I don't  know any way of
forcing air except by machinery of some kind.    I never saw
air forced in mines by machinery, but I have seen air forced
into blast iron furnaces for making iron."

And thereupon the plaintiff  immediately asked this addi-
tional question of  said witness :

"State whether there  was  any other means in use at that
time, by which said mine could have been ventilated at such
point ?"

Against the  objection of the detendants the witness was
permitted to answer the question as follows :

"There was no other means only by forcing air in by ma-
chinery as I stated.    There  could have been other means

used at that time. They could have forced air in by machinery."

The defendants excepted to said questions and answers.

All the testimony of this witness up to the propounding of these two questions was made a part of the bill of exceptions by reference to the third bill of exceptions, which certifies all the evidence. With reference to the ventilation he says : "We used means up there by drawing air. We had a furnace and a box fixed to draw the air. Furnace draws the air through and creates a draft by drawing the bad air out. The furnace stood at the out-crop of the coal, and had the box for flue upon the hill. We had a furnace when running the long drift. At the time I was burned, the furnace was not in use. The furnace was destroyed and they were using the boxing in the heading I was in. The boxing was inside the heading, but no furnace. If there was any air, the air come in through the boxing to the face of the heading and went out through the drift." The witness said he had been a miner for twenty years, and had "never seen air forced in mines by machinery."

By admitting this evidence the court virtually instructed the jury, that, if the defendant could have so ventilated the mine by forcing in air by machinery, (a process so unusual, that a miner of twenty years experience had never seen it tried,) as to have expelled the fire-damp and kept the mine free therefrom, and thus have prevented the explosion, he was guilty of negligence in failing to do so. Upon the authorities, which we have cited, and according to reason and the rules, which have been laid down, the admission of this evidence was error to the prejudice of the defendants, for which the judgment will have to be reversed and a new trial awarded.

The second bill of exceptions is, also to the admission of evidence. The witness Helsley was asked the following question : "What was the condition of that mine, when you quit working there ?"

Against the objection of the defendants the witness was permitted to answer :

"The air was bad at that time. There was a right smart of *fire-damp* at that place and I quit on account of it. I mean

by *fire-damp*, this explosive gas." To which question and answer the defendants excepted. This witness, as the bill of exceptions shows, had taken Woody's place in the heading where Woody was hurt by an explosion, about six weeks before plaintiff was injured. No reason is given by counsel, why this evidence was not proper. It seems to me, it is pertinent and proper, as showing the condition of the heading, and to rebut the inference, that there was a sudden accumulation of *fire-damp* in the mines. It was proper as tending to show the negligence of the defendants.

As the case will have to be remanded for a new trial, we will not speak of the weight of the testimony, as it may be different on the next trial; but as no instructions were asked, and there is no other case in the books, so far as my research extends like this, we deem it proper to discuss another question presented by counsel for plaintiff in error, not as it relates to the evidence in this case now, but as it may relate to it on the next trial; whether, conceding for the sake of the argument, that Work and Reese, who were killed by the explosion, were fellow-servants of the plaintiff, and that in violation of instructions they went into the heading with their ordinary mining lamps lighted, without taking the safety-lamp, as instructed to do and thus ignited the gas and in consequence it exploded, killing them and injuring the plaintiff, who did not contribute to the injury, the plaintiff could recover, if the jury believed from the evidence, that through the negligence of the defendants, the *fire-damp* or explosive gas was in the mine? Of course all these assumed facts were questions for the jury; and if we were considering this question on a motion for a new trial, if there was evidence tending to prove the negligence of the defendants and tending to show that there was no negligence on the part of the fellow-servants, Work and Reese, the whole question of the responsibility of the defendants would have to be left to the jury. (*Johnson* v. *Brown*, 61 Pa. St. 58; *Washington* v. *B. & O. R. R. Co.*, 17 W. Va. 190.)

In *Wright* v. *R. R. Co.*, 25 N. Y. 562, it it was decided, that a master is not chargable for injuries to one servant caused by the negligence of another, on the ground of the unskillfulness of the latter, unless the injuries resulted from

such unskillfulness. In *Warner* v. *R. R. Co*, 39 N. Y. 468, it was decided, that the only ground of liability of the master to an employe for injuries resulting from the carelessness of a co-employe, which the law recognizes, is that which arises from personal negligence or from want of proper care and prudence in the management of his affairs or in the selection of his agents or appliances, &c.

In *Booth* v. *Railroad Co.*, 73 N. Y. 38, it was decided, that where the negligence of the engineer of a train in running it is contributory with that of the company in not sending a sufficient number of brakemen, and both together cause an injury to an employe, the negligence of the engineer does not relieve the company from liability.

In *Cayzer* v. *Taylor*, 10 Gray 274, it was decided, that a master is liable to his servant for injuries resulting from a defect in his machinery, although the negligence of a fellow-servant contributes to the accident.

In *Crutchfield* v. *Railroad Co.*, 76 N. C. 320, it was decided, that a master is liable for an injury to a servant resulting from the negligence of a fellow-servant, if the master contributes to the negligence.

In *McMahon* v. *Henning*, 1 McCrary C. C. 516, it was decided by McCrary judge, that a master is liable for negligence in the use of defective machinery, whereby his servant was injured, although the negligence of a fellow-servant contributed to the injury. There is nothing contrary to this view in *Washington* v. *B. & O. R. R. Co.*, 17 W. Va. 190, or *Faucet* v. *R. R. Co.*, 24 W. Va. 755. In both these cases it was held, that the cause of an injury in contemplation of law is that which immediately produces it as its natural consequence, and therefore, if a party be guilty of an act of negligence, which would naturally produce an injury to another, but before such injury results, a third person does some act, which is the immediate cause of the injury, such third person is alone responsible therefor, and the original party is in no degree responsible therefor, though the injury could never have occurred but for his negligence. The casual connection between the first act of negligence and the injury is broken by the intervention of the act of a responsible party, which act is in law regarded as the sole cause of the injury.

In the cases, which I have cited from other States, the two causes together, the negligence of the master and the negligence of the fellow-servant, caused the injury to the servant. If therefore it appears, that the proprietors of a coal-mine had been negligent in permitting *fire-damp* to accumulate in their mine, which would not produce any injury until ignited, and if it were ignited by a fellow-servant, who went into the dangerous part of the mine with a lighted lamp contrary to the orders of the proprietor of the mine, and by such lighted lamp the *fire-damp* was ignited and exploded by which a servant was injured, such explosion and injury would be directly and immediately caused by the act of the fellow-servant and not by the negligence of the master, and the master under these circumstances would not be responsible for such injury. We do not say that these were the facts. It may be that those, who went into the mine, did not take lighted lamps, and that the gas was ignited in some other way. It may be, that the mine " boss " had not done his duty in exploring the mine with the safety-lamp to discover the presence of gas; and it may be that no order had been given not to enter that part of the mine without taking the safety-lamp ; all these are questions for the jury as to the manner in which the explosion occurred.

It is unnecessary to consider the affidavits as to after-discovered evidence.

For the errors pointed out the judgment is reversed with costs, the verdict of the jury set aside, and the case remanded for a new trial.

Snyder, Judge :

I am of opinion that the declaration in this case is too general as to the facts, which, it is claimed, constitute the negligence, which, the plaintiff alleges, caused the injury. I also think that it is demurrable, because it sets out facts, which tend to show negligence on the part of the plaintiff. While it is not ordinarily necessary in actions of this character to negative negligence on the part of the plaintiff, still where the declaration does state facts, which tend to show such negligence, it ought to allege, that the plaintiff was without fault.

Reversed.   Remanded.