# CHARLESTON.

## Davis's Adm'r *v.* Nuttallsburg Coal & Coke Co.

\* (Holt, Judge, absent.)

Submitted June 21, 1890.—Decided December 13, 1890.

1. Master and Servant—Contributory Negligence.
 Where a servant wilfully encounters dangers which have been

---

\*Case submitted before Judge Holt's appointment.

pointed out to him, and does not avail himself of the rules and regulations which the master has provided to avoid and avert such danger, the master is not responsible for an injury occasioned thereby.

2. MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE.

When a servant enters the employment of a master, he assumes all the ordinary risks incident to the employment, whether the employment be dangerous or otherwise. ·

*St. Clair & Gaines* and *L. G. Gaines* for plaintiff in error cited :

27 W. Va. 285 *et seq.;* 1 Laws. Ri. Rem. & Pr. § 311, 313; 31 W. Va. 143, P't 6, Syll ; 11 W. Va. 14 *et seq.;* 5 Ohio St. 541; 21 W. Va. 712 ; Code (1887) Appendix 979 s. 11; 2 W. Va. 104; 6 W. Va. 258 ; 14 W. Va. 100 ; 18 W. Va. 1 ; Id. 766.

*L. D. Isbell, C. W. Dillon* and *T. L. Michie* for defendant in error cited :

16 W. Va. 308; 31 W. Va. 494; 28 W. Va. 732 ; 31 W. Va. 121; 26 W. Va. 117; 21 W. Va. 709.

ENGLISH, JUDGE :

On the 30th day of July, 1889, Robert H. Boone, sheriff of Fayette county and as such administrator of the estate of John G. Davis, deceased, brought an action of trespass on the case in the Circuit Court of Fayette county against John Nuttall, L. W. Nuttall, Jackson Taylor, and W. H. Holland, partners in trade in the mining of coal and manufacturing of coke, under the firm name of Nuttallsburg Coal & Coke Company, claiming ten thousand dollars damages for an injury received by said John G. Davis, by slate falling upon him while engaged as a laborer in the coal mine of said company, which resulted in his death. The defendants demurred to the declaration, and to each count thereof, which demurrer was overruled, and thereupon the defendants pleaded not guilty, and issue was thereon joined, and on the 28th of September, 1889, the cause was submitted to a jury, which, on a subsequent day, rendered a verdict for the plaintiff, assessing his damages at two thousand five hundred dollars, and on a subsequent day the defendants moved the Court to set aside the verdict of the

jury, and grant them a new trial, which motion was over-ruled, to which ruling of the Court the defendants excepted, and the Court rendered a judgment on said verdict, and the defendants took a bill of exceptions to the ruling of the Court in giving certain instructions (Nos. 1, 2, 3, and 4) asked for by the plaintiff, and in refusing to set aside the said verdict and grant them a new trial, and applied for and obtained this writ of error.

It appears from the testimony in the cause, which is set forth in the bill of exceptions, that the plaintiff's intestate was engaged in the defendants' coal mines in said county as a coal-miner and extra coal-hauler, and that on the 25th day of August, 1888, a witness, William Derrico, heard Richard Seymore, the bank-boss at the said mine, ask said Davis to haul coal in said mine that day; that said Davis did not want to drive, but the bank-boss told him that, if he did not drive, he, Davis, would lose his "turn," which amounted to having no work at said mine, as a miner, that day; thereupon witness and said Davis started to work as coal-haulers for that day, Davis going to haul upon the entry in said mine, which was being driven by Charles Higgins, a miner employed by defendant; that said Davis had hauled coal on the day previous in the same entry in said mine; that after dinner, about one or two o'clock, witness was informed that slate had fallen upon Davis, and he went to him, and found him near the parting of room No. 1, which was being worked at the time by John Small, he being struck on the back by a piece of slate described by witness as a "slip," which was the thickest in the middle and tapered to a feather edge at both sides thereof. It was not a "horseback," or "kettleback," as miners understand, and was eight to ten feet in length, two and a half to three feet in width, and from eight to fourteen inches in the center. He assisted in taking said Davis home, and he died from said injury about ten o'clock that night. Said Davis's regular working place as a miner was in one of the rooms, not in the entry in which he was injured; that about two weeks prior to Davis's injury witness and other miners told Isaac Calloway, who was a driver at the time, not to drive on said entry, because it was dangerous. Calloway went

for the mine-boss, and he came down, and told witness and others to go in their rooms. He, Seymore, sounded the slate, and said it was safe ; that the roof in said entry was not in bad condition at the time Davis was killed. It had been, but the mine-boss had had the slate shot down, and the roof fixed, so as to make it safe. Witness had hauled coal on this entry for two weeks preceding, and on the day of the injury to Davis, but discovered no bad or dangerous slate in roof, and regarded the same as safe ; that a miner can tell a " kettle-bottom," " horseback," or " slip," without any difficulty ; that there was no draw slate in the entry where Davis was injured ; that Miller and Godby put timbers in this entry, where Davis was injured, the next week after it occurred. It was the business of the mine-boss to look after loose slate, and he had a man by the name of Goosetree to assist him in his work. It was not the duty of drivers to look after the loose slate.".

Isaac Calloway, also introduced by plaintiff, stated that the roof in said entry had been bad for about three weeks prior to Thursday preceding the accident ; that he informed the bank-boss of this, and that he was afraid of the slate in said entry ; that the miners said it was bad, and he did not want to drive there, and the bank-boss told him he could leave or drive where he put him ; that the bank-boss had some of the slate shot down at this time, but that it was getting bad again on Thursday at the place where Davis was injured, and, after driving all day on Thursday in this entry, he refused to drive any more until the slate was taken down at this place ; that, having learned that the slate was taken down on Thursday night, he returned on Saturday morning to drive in this entry, and would have done so, but that Davis preferred to drive there, rather than to drive in the hall-way at the foot of this entry, to the pit mouth, because there was more spragging to do there, and which he understood how to do better than Davis ; that he had been driving on the entry where Davis was injured for four months prior to the time of the injury, and did not know of any opportunity he had to know the slate in the roof was dangerous ; that it was not his business to inspect the roof, but it was the duty of the bank-boss ; that loose

slate was discovered by sounding it with a pick or hammer, and, when discovered, it was wedged or shot down; that some of the men had shot down some of the slate about three weeks before; that Samuel Goosetree was also employed to look after slate; that no props were used in this entry until after Davis was killed, but some were put up the week afterwards; that he had known his brother Marshall make five dollars a day in said mine; and that an average miner makes about three dollars a day.

Frank Shepherd, another witness for the plaintiff, stated that he was working for defendant when Davis was injured, assisting Charles Higgins, driving the entry in which Davis was injured at that time; had frequently gone up and down the entry to and from his work. That there had been some loose and bad slate in the entry in which Davis was injured, and, before the time of the injury, it had been shot down. He could tell it was bad by its working and cutting. That Davis did not give him any notice that there was loose slate in the entry that day, nor did he ask him to take any down. The slate that fell was a horseback or kettle-bottom.

George Howard, a witness for plaintiff, stated that the slate was bad where Davis was injured, some had to be taken down every day or two; that bad slate could be made safe by posting it, or taking it down.

James Delaney, a witness for plaintiff, also stated that slate in said entry was in bad condition, and that, if the hall-way was dangerous, the boss could remedy it by putting timbers in it. On cross-examination, he stated he never was in any part of this entry but once, about August 1, 1888; that he passed along the entire length of said entry, and inspected the roof as he went along; that he found the identical spot where Davis was injured; that the roof at the time was in bad condition; that he stopped, and placed his hand over the loose slate in the roof; that there was no mark or special object to call his attention to that particular place, yet he knew it was the identical place where Davis was injured. He was in that part of the mine looking for a room to work in on said entry, and would have done work there, if he could have secured a room, and would have felt himself

secure and safe while working, and he was always very particular where he worked.   He saw but two or three places where slate was bad on said entry, and one of these places was where Davis was injured, and that no timber or props were in the entry at the time of the injury; that, after loose slate is shot down, it ought to be inspected every day.

James M. Callowey, another witness for the plaintiff, stated that he was hauling water in said entry, and emptying it immediately under the slate that injured plaintiff and, although he had a brighter lamp than the miners use, discovered no defect in the roof at that point, and regarded it perfectly safe; that it was the business of the bank-boss to examine the roof in the entry; that the bank-boss, by inspection, can tell when it is dangerous in the top of an entry. The place was not timbered, but was timbered shortly afterwards.   That, if it had been timbered, it could not have fallen without giving deceased notice.   And with this evidence the plaintiff rested his case.

· Now, in this case, as the evidence (not the facts proved) is certified, under the ruling of this Court in *Black* v. *Thomas*, 21 W. Va. 709, this Court will not reverse the judgment, unless, after rejecting all the conflicting parol evidence of the exceptor and giving full faith and credit to that of the adverse party, the trial-court still appears to be wrong. Bearing this rule in mind, and looking only to the evidence introduced by the defendant, about which there is no conflict, we find that the defendant proved by Charles Higgins that he had been a coal-miner in England and America for eighteen years; had been engaged at defendant's mine for eight years; was driving the entry at the time upon which the accident occurred.   Frank Shepherd was assisting him on the day Davis was injured.   That Mr. Holland, the superintendent of the mine, required him, and it was the rule of the defendants that all entry drivers in said mine, when notified of loose slate in the entry they were engaged in driving, to stop the entry work, and immediately go and remove such loose and dangerous slate.   That it was also a rule in said mine, known to all persons working therein, · that when a driver discovered loose or dangerous slate in the entry in which he might be engaged hauling coal, it

then and there became the duty of such driver or coal-hauler to at once report the facts to the man engaged in driving the entry in which such loose coal or slate was so discovered, in order that the danger might be promptly removed; that the deceased knew of this rule or custom in the mine; that he in pursuance of said rule, had several times before the time of said accident, while engaged in hauling coal on said entry, notified witness of loose slate in the roof of said entry, and witness went at once and took down all loose and dangerous slate which deceased knew of at the time; that he, witness, passed along said entry three or four times a day; generally the top of said entry was very good; that there were a few bad places in it, where the slate had to be taken down; that on Thursday, before Davis was injured, Mr. Holland, the superintendent, told him there was a loose piece of slate on said entry at a point in said entry, somewhere between room No. 9 and room No. 11, and directed him to go and post it, or take it down, and to go through all of said entry, and examine the roof, and remove any and all loose slate found therein that evening; that he did as he was directed, and found some loose slate between rooms No. 1 and No. 2 on said entry; that he took or blasted down the loose slate, and regarded it perfectly safe that evening. Mr. Goosetree, who was employed by defendants for the express purpose, assisted him; that he saw the slate that fell on plaintiff. It was seven feet long, and six or seven inches thick in the center, tapering to a feather edge. It was a slip. That a slip can sometimes be discovered, and again it can not, and the same can be said of a "kettle-bottom;" that Mr. Seymore, the bank-boss was a competent man for the place; that after the accident timbers were put in said entry where it occurred, but that the roof above the said timbers does not show any pressure upon them, and the roof is good; that the piece of slate could have been held up by posting, but witness never saw an entry in which there was no loose slate, nor an entry in which none was ever taken down, and for that reason an entry is not considered bad or dangerous without being propped, the practice being to look after the loose slate, and when it is found to take it down.

The defendants also introduced William H. Holland as a witness, who testified that he was a mining engineer by profession, which he had followed for thirty years; that he is one of the defendants, and the general manager of their colliery at Keeney's creek, and also at Nuttallsburg; that he planned and laid out the workings of Keeney's Creek mine, on the double-entry system, which is the best for ventilation, and the safest under which to operate the mines on New river; that the rooms are forty five feet apart, and thirty six feet on the face of the entry; that Richard Seymore was their mine-boss, and had been for three years; that he had been in the business all of his life, and was a competent man for the place; that it was a rule of the company, and he always told the entry-drivers, that they must take down all loose slate on their respective entries, whenever they were informed of it, and that they must quit mining, or whatever work they were engaged in at the time they got notice, and take down the loose slate, or remove any other danger which might be in the entry, and that they would receive the same pay for such work as though they were digging coal at their respective places; that they required their drivers or haulers, if they discovered any loose slate in the entries, to immediately report the same to the entry-driver, whose business it was to take the same down at once; that in addition to these precautions, they employed a man for the express purpose of having some one constantly going over the mine, looking after its condition and security, rating him as assistant mining-boss, and, at the time Davis was injured, a man by the name of Goosetree was doing that work, who was an old miner, and competent; that he frequently went through and examined the mines himself, and did so on Thursday, before the accident, passing along the entire entry; that he noticed a place about seventy feet from where Davis was injured, where there was some loose slate, and had Mr. Higgins to go at once and fix the place, and also take a general view of the roof all along the entry; that he ordered some posts to be put in the entry after the accident, although he did not think it necessary; that he had recently examined it, and, if the timbers were

removed, there would be no fall of slate; that John Small, who worked in room No. 1 at the time of the accident, was an old and competent miner, and was for a long time the mine-boss at Keeney's Creek mine.

The defendants also proved, by H. J. Tucker, that he was State mine inspector for the second district at the time of the accident, and at once visited the mine, having been notified by W. H. Holland of the accident, saw the roof where the accident occurred, and, from its appearance, judged it to be a slip; that slips may be in the formation of the roof, and not discoverable; that they sometimes drop out suddenly, again, they crack and spring, in which case they could be seen; that Mr. Holland was posting the entry at the time of his visit; that posting may have been necessary to make the entry perfectly safe in some places, that he had visited this entry before in his official capacity, and regarded it safe then, and also at the time he visited after the accident; that the defendants were careful managers of their mines, and always complied with his orders; that the general character of the roof in the mine was good, and the superintendent and mine-boss were capable and efficient men.

Richard Seymore, the mine-boss, also stated that the haulers, including Davis, were told by him that, in case they found loose slate on the entry, to go at once and tell the entry-driver, and it was the business of the entry driver to take down such slate; that he should do this if he saw it himself, or got information from any one else; that Higgins was driving the entry when the accident occurred; that he, witness, visited all the working-places in the mine every three days, and was over this entry the day before the accident occurred, and it was safe; that this was the only accident that ever occurred in this entry, and there never was but one slate fall in it before; that you can rarely ever see a kettle-bottom before it falls out; that there was no fall of slate at this place before.

Samuel Goosetree also stated that he had worked in mines all his life, and in this mine for the past seven years; that on Thursday, before the accident occurred, he helped Charles Higgins to take down all the loose or dangerous

slate to be found along the entry, and left it in perfectly safe condition that night; visited it again on Friday evening, and it was in good condition; that the general character of the top formation in this mine is good.

John Small, a witness for defendant, stated that he had been a miner for thirty five years, and was mine-boss at Keeney's creek for three years; that he went to work about six o'clock Saturday morning, day of accident. As he was going into his room he noticed some pieces of slate lying on track where Davis was hurt, and this caused him to examine the roof; that he found a piece of slate that was loose, and he thought dangerous; that soon afterwards Davis came into his room after a loaded car; that he told him there was a dangerous piece of loose slate in the roof near his parting, and went out to the entry with him to bring in the empty car, his son being with him; that he took his lamp and held it up under the piece of slate, and showed it to Davis, and told him to go and tell entry-driver to take it down, but he, Davis, continued to haul coal over this entry during the forenoon; and after dinner, about two o'clock, while Davis was driving, the piece of slate he showed him in the morning fell upon him, and injured his back; that this slate fall would be called by some persons a "pot-hole," by others a "kettle-bottom," by others, again, a "slip."

Charles Small, the son of John Small, corroborated his father as to his pointing out this loose slate to said Davis on Saturday morning, and stated that he heard his father tell Davis to go and tell the entry-driver to take it down. John Small also stated that Davis knew that it was his duty to tell the entry-driver to take this slate down.

The four instructions asked for by the plaintiff and given by the court, were the same in substance, although differing somewhat in form, and read as follows:

"(1) The court instructs the jury that, if they believe from the evidence that the defendant company, or mining-boss, did not make the proper examination of the particular entry or room in the mines where John Davis was killed, and that John Davis was injured in consequence of such neglect, and without any fault on his part, then, in

the absence of proof of contributory negligence on the part of John Davis, deceased, the defendants are liable."

"(2) The court further instructs the jury that, if they believe from the evidence that John Davis was killed by reason of an unsound, unsafe, and defective roof, under which he was working, and that the defendant neglected and failed to have said roof carefully inspected by persons competent to perform that duty, and that the plaintiff did not directly contribute to the injury, then the negligence of such person is the negligence of the company, and the company is liable."

"(3) The court further instructs the jury that, if they believe from the evidence that the deceased, John Davis, while in the performance of his duty, and without any fault on his part, was injured and killed by a fall of slate from overhead in the roof of the mine of the defendant company, in which he was working and that such defect in the roof of said mine, or fall of slate therefrom, was one that could have been discovered by a careful inspection of the roof of said mine, by a competent mining-boss, and avoided by the defendant, then, whether such defect was known to the defendant or not, it is guilty of negligence in the premises."

"(4) The court instructs the jury that, if they believe from the evidence that the defendant company, or any person in authority representing the company in this respect, had knowledge of the danger, and could, by due care and diligence, have known the danger, and that the deceased, John Davis, was ignorant of the danger, and was without fault on his part, and that the defendant company lulled John Davis, deceased, into a sense of security by requesting, directing, or ordering him to drive a mule to haul coal in a certain dangerous entry of the mines of the defendant company, and the said Davis, deceased, acting under such order or direction, did drive such mule in such entry, and that the death of the said John Davis was caused by such danger, then the defendant company was guilty of negligence."

I see no valid objection to said instructions Nos. 1, 2, and 4, and think the court acted properly in overruling the exceptions thereto.

Instruction No. 3, however, is subject to this criticism that it is too general, and should have stated "that as such defect in the roof of said mine, or fall of slate therefrom, was one that could have been discovered by the inspection required by law of the roof of said mine by a competent mining-boss, and avoided by the defendant, then, whether such defect was known to the defendant or not, it is guilty of negligence in the premises," and I think it should have been rejected for that reason. Now, while it is true that the burden of proof, as to contributory negligence, rests upon the defendant, and each case must depend upon the circumstances surrounding it, yet it appears to me that the evidence clearly shows that the plaintiff's intestate was fully cognizant of the rules and regulations of miners and coal-haulers in said mine, in reference to loose or dangerous slate, when discovered in the roof of the entry. It is further shown that the mine of the defendant was under the care and management of competent, careful and experienced men, who had served a long apprenticeship at the business; that the evening before the accident occurred the mine-boss had traversed the entire length of the entry in which the accident occurred, and thought it perfectly safe, and the evidence is that defects of the character known as "slips" or "kettle-bottoms" in the roof are difficult to discover, unless they crack or spring down; that the general character of the roof of this mine was good, and, although timbers had been placed in this particular entry since said accident, yet it was unnecessary, and there was no pressure thereon from the roof, and that the slate would not fall if they were removed; that this was the only accident that ever occurred in said entry; and that there was but one fall of slate before that time in said entry. It further appears that the defendants had in their employ an assistant mine-boss, whose duty it was to look after and pay special attention to the condition of the roof in said mine. What more care and precaution the defendants could have observed it is difficult to see.

But how was it with the plaintiff's intestate? It is clearly shown by John Small and his son, Charles, that the attention of said Davis was called particularly on Saturday

morning, when he first went to work, to this loose piece of
slate. Mr. Small held up his lamp, and showed it to him,
and advised him to go and tell the entry-driver of the fact
in accordance with the rules of the bank, but he disregarded
his advice; and he hauled on, passing under it, until two
o'clock in the afternoon, when the slate fell upon him, and
caused his death. Neither did he, in accordance with sec-
tion 11 (page 979, Code) in the act in reference to coal-
mines and mine inspectors, notify the mining-boss or his
assistant of the fact that props, caps, and timbers were re-
quired at that place, which said section provides, in case of
emergency, may be ordered immediately upon the discovery
of any danger.

In the case of *Snyder* v. *Railway Co.*, 11 W. Va. 17 (sev-
enth point of syllabus) this Court held: "Negligence of
the plaintiff in such cases, which precludes a recovery, is
where, in the presence of seen danger (as where the fire has
been set) he omits to do what prudence requires to be done,
under the circumstances, for the protection of his property,
or does some act inconsistent with its preservation." The
same law applies where the life or limbs of the plaintiff are
endangered. Mr. Higgins, who was driving the entry on
that day, and Mr. Calloway, who was assisting him, both
testify that said Davis never informed them as to said loose
slate, or asked them to take it down.

In the case of *Berns* v. *Coal Co.*, 27 W. Va. 285, it was
held: " If a servant wilfully encounters dangers, which
are known to him, or are notorious, the master is not re-
sponsible for an injury occasioned thereby." * * * *
" The master must provide for the safety of his servant, as
far as can be reasonably expected, under the circumstances,
but he is not obliged to take more care of his servants than
he would be expected as a prudent man to take of himself."
* * * "When a servant enters into the employment of
a master, he assumes all the ordinary risks incident to the
employment, whether the employment is dangerous or
otherwise."

In the case of *Downey* v. *Railway Co.*, 28 W. Va. 732, this
Court held: " The general rule is, that in an action for
negligence, the plaintiff can not succeed, if it is found by

the jury that he has himself been guilty of negligence or want of ordinary care, which contributed to cause the injury. But this rule is subject to this important qualification: Though the plaintiff may have been guilty of negligence, and although that negligence may in fact have contributed to the injury, yet, if the defendant could, by the exercise of ordinary care and diligence, have avoided the injury, the plaintiff's negligence will not excuse or relieve the defendant from liability." The defendant, however, had provided by its rules and regulations for just such a case as this, when the danger was made apparent to plaintiff, who knew where to go to have it removed, but he wilfully disregarded the rule, and took the risk upon himself.

The evidence is that these slips or kettle-bottoms were difficult to discover, and, although the mine-boss, using all the care that could be required, passed along there the evening before and examined the roof, he failed to discover anything wrong; but, on the other hand, Davis, after the danger was pointed out and seen by him, neglected to use the means which the defendant, and the law, had provided for his protection. It will be perceived that section 11 of said act, above referred to, provides that the mining-boss " shall see that, as the miners advance their excavations, * * * all loose coal, slate, and rock overhead, in the working places, and along the hallways, be removed, or carefully secured, so as to prevent danger to persons employed in such mines; " showing that the law does not contemplate putting props along the entire entry, but the boss is to have them ready, and in place, to be furnished when danger is discovered; but the plaintiff in this case gave no notice after the danger was shown him. Considering, then, the facts in this case, and the law bearing thereon, my conclusion is that the judgment of the Circuit Court must be reversed, the verdict set aside, and the cause remanded with costs to the plaintiff in error.

REVERSED. REMANDED.